Boland *vs.* Klink.

---

BOLAND *vs.* KLINK.

[Warner, Chief Justice, being engaged in presiding over the senate organized as a court of impeachment, did not sit in this case.]

1. If a sale to the husband has been agreed upon, and he cannot give security, and therefore his wife becomes the purchaser, either directly or through him as her agent, and gives the required security in person, it is the same as if no sale to him had been contemplated. The debt is hers, not his, and the act of conveying her property as security binds her.
2. Where the internal probabilities of the case, together with important documentary evidence, bear against the verdict, and the parol evidence is conflicting, and the presiding judge has granted a new trial, the supreme court will forbear to interfere.
3. Discretion in the matter of granting or refusing new trials is no novelty, but a doctrine which received early recognition in this court. It is, however, amenable to control.

Husband and wife. Debtor and creditor. Sales. New trial. Before Judge CRAWFORD. Muscogee Superior Court. May Term, 1879.

Grace Boland filed her bill against Charles A. Klink, in which she alleges that on the 28th day of September, 1874, she being a married woman, the wife of A. J. Boland, owned as her separate estate a certain house and lot in the city of Columbus, to-wit: the south half of city lot number three hundred and thirteen, said property being of the value of three thousand dollars; that on the 28th of September, 1874, her husband having purchased from defendant a stock of liquors, cigars, etc., then contained in the Sans Souci saloon, in the city of Columbus, for the sum of twelve hundred dollars, he was unable to pay the money, and defendant demanded security, which he was unable to give, but that she, yielding to his persuasions, consented to become his security, and did convey her house and lot to defendant for the purpose of securing said debt of her husband, taking from him at the same time a bond conditioned to reconvey to her upon the payment (at any time within two years from the date of the bond) of the twelve hundred dollars, with interest thereon at the rate of one per cent. per month; that she never received a dollar for said property; that defendant at once took possession of it and used and enjoyed the rents and profits until the 23d day of September, 1875, when, without her knowledge or consent, he sold the same to one Ryan, and that on the same day Ryan, without her knowledge or consent, sold to one Wynne, and that Wynne has ever since been in possession. She further alleges that at the May term, 1877, of Muscogee superior court, she brought an action of ejec'ment against Wynne for the recovery of said property; that said cause was tried at the November term, 1877; that on the trial Wynne claimed and proved that he was a *bona fide* purchaser from Ryan without notice of her claim and without notice of the fact that the property was conveyed by her for the purpose of securing a debt of her husband, and she therefore failed to recover the property. She further alleged that the rents of said house and lot since it was conveyed to defendant, amounted to two hundred dollars per

annum, and that he refused to account to her for the value
of the house and lot, or for the rents and profits.  She
waived discovery, and prayed that defendant might be held
as a trustee for her in respect to said property, and that he
be decreed to account to her for the value thereof, and for
the rents and profits, etc., and that she might have general
relief.

Defendant answered, alleging that in May, 1874, A. B.
Klink, brother of defendant, was the owner of the furni-
ture, stock and fixtures belonging to and comprising the
bar and restaurant known as the Sans Souci, in Columbus ;
that said A. B. Klink had before that time rented the prem-
ises from James Kivlin until the 1st day of October, 1876,
and that defendant was his security for the rent ; that said
A. B. Klink was indebted to defendant in the sum of
$2,300.82 and in the month of May, 1874, he mortgaged
to him the entire stock, etc., of the Sans Souci to secure
said debt ; that in the month of September, 1874, Boland
(husband of complainant) proposed to purchase the stock,
fixtures, etc., of the Sans Souci from defendant and to pro-
cure his wife to mortgage her house and lot as security, but
defendant, having been advised by counsel that such a
mortgage would be null and void, refused to trade with
him, and thereupon complainant herself proposed to be-
come the purchaser, and that it was then agreed that she
would purchase the saloon at the price of $1,200 ; that de-
fendant procured A. B. Klink to convey all the furniture,
stock and fixtures of said bar and restaurant to complainant,
and that defendant, in consideration of said conveyance,
satisfied his mortgage on said property ; that complainant,
to secure the payment of said $1,200, did execute to de-
fendant an absolute deed to the premises described in the
bill, and he made and delivered to her a bond in the sum of
$2,500.00 to reconvey the property to her at any time within
twenty-four months upon the payment of the $1,200.00
with interest at the rate of one per cent. per month.  De-
fendant denied using any rents and profits of the property,

and said they were all consumed.in the payment of install-
ments upon a mortgage to a building and loan association,
which incumbered the property at the time of the convey-
ance to him ; that complainant took possession of said Sans
Souci, and that Andrew J. Boland, as her agent, managed
and controlled it until the 10th day of April, 1875, when
she sold it to one A. M. Hunt ; that complainant paid de-
fendant $300.00 in part compliance of the terms of said bond
for title ; that on the 23d of September, 1875, complainant
surrendered to defendant his bond for title, and directed
him, upon the payment of the balance of the $1,200.00 by
James W. Ryan, to convey the said premises to Ryan ; that
Ryan did pay the balance of the $1,200.00, and defendant
conveyed the house and lot to him ; that Ryan did, on the 23d
of September, 1875, convey to Wynne, and that Wynne
has ever since been in possession of the same. Defendant
denies that said conveyance was made without the knowl-
edge or consent of complainant, but says that it was all
done with her full knowledge and consent. Admits that
complainant brought an action of ejectment against Wynne
for the recovery of the premises, but denies that she failed
to recover because Wynne claimed and proved that he was
a *bona fide* purchaser from Ryan without notice of the fact
that the property was conveyed by complainant for the
purpose of securing her husband's debt, and alleges that
Wynne claimed and proved that the property was conveyed
by complainant for the purpose of securing her own debt,
and not the debt of her husband, that this was the issue
submitted to the jury, and that the jury found the issue
against the complainant, and defendant pleads the verdict
and judgment in said case in bar of complainant's right to
recover on this bill.

The evidence introduced by the parties sustained the
allegations made in their respective pleadings.

The court charged the jury and submitted to them cer-
tain issues of fact, viz :

1st issue : Did Andrew Boland buy the Sans Souci, and

did Mrs. Boland make this deed as security for the money, or did Mrs. Boland purchase the Sans Souci and make this deed to her house for the payment?

2d issue: If Andrew Boland bought the Sans Souci, and the deed was given as security for his debt, then what is the value of the house and lot with interest thereon to date?

3d issue: If Andrew Boland bought the Sans Souci, and the deed was given as security for his debt, then did Klink receive his bond for title back from Mrs. Boland with directions from her to convey the house and lot to Ryan, and did he convey the house and lot according to her directions and account to her therefor, or did she afterwards ratify such conveyance?

And the jury having brought in their verdict in favor of the complainant upon each of the issues, and having found the value of the property with interest, the court entered up a decree against defendant for three thousand one hundred and forty-one dollars, the value of the house and lot, with interest as found by the jury.

Defendant moved for a new trial on substantially the following grounds:

1. Because the court refused to charge the jury as follows: "If the jury believe from the evidence that the bill of sale to the Sans Souci was made to complainant and not to her husband, then she owed defendant the purchase money, and the deed given to secure the same would be good," but qualified the said request as follows: "Provided the facts are what is implied by a bill of sale."

2. Because the court erred in submitting the 1st and 3d issues to the jury as above set forth.

3. Because the verdict was contrary to evidence, law, justice and equity.

The motion was sustained, and complainant excepted.

CRAWFORD & McNEILL; BLANDFORD & GARRARD; THORNTON & GRIMES, for plaintiff in error, cited Code, §§2629,

1783, 2329, 3151; Perry on Trusts, 217; 53 *Ga.*, 435; 55 *Ib.*, 383; 41 *Ib.*, 12, 295.

PEABODY & BRANNON, for defendant, cited *Hull vs. Sullivan* and *Allen vs. Young, ante;* 60 *Ga.*, 588; 49 *Ib.*, 139; 62 *Ib.*, 86; 55 *Ib.*, 412.

BLECKLEY, Justice.

1. What matters it that there was an effort to sell to the husband if he was unable to give the required security, and if the wife stepped in and made the purchase, either directly or through the husband as her agent, she giving the security and obtaining title to the property? It is just the same as if no sale to the husband had been contemplated. It is in vain to urge that a married woman has no use for a barroom or a drinking saloon. Nobody has use for such an establishment, except to make money out of it; and married women, as the law now stands, may invest their money or their credit as they please in their own business, and their husbands may be their agents to carry on any business in which they may think proper to engage. Whoever will regard the conduct of married women as it is presented through evidence in the courts, will see that they are under the influence of their husbands in the selection of business in which to invest their capital, and are, moreover, inclined to yield the active control of their business affairs to their husbands. It is their privilege to do so, and when they exercise the privilege they must abide by the consequences. Doubtless, in most instances the husband is the safest adviser to which a wife can resort; and whether so or not, as long as the world stands and the marriage relation subsists, wives will go to their husbands for counsel, and be guided by such as they receive from that source. And, generally, when a wife wants an agent to represent her in a business transaction, she will select her husband. He may be quite unfit to promote or protect her interest, but she is apt to think otherwise, and to trust him accordingly. When she

makes a purchase through him, it is the same as if she made it in person ; and when the transaction creates a debt for property which is transferred or conveyed to her by the creditor, and she gives the required security in person, the debt is hers, not her husband's, and the act of giving security binds her. *Hull vs. Sullivan*, last term.

2. In some rare instances sympathetic juries act as if they were champions of the fair sex, and felt commissioned to protect ladies against their own weakness and folly. This is an amiable but mistaken chivalry. In the court-house, the standard of justice for both sexes is the same. Like the sun, the law shines on all who are in the same place with equal warmth and splendor. The most charming and attractive woman in the universe, loaded down with misfortune, is not to prevail as a suitor where she is in the wrong, be her adversary whom he may. In the present case, the internal probabilities, as well as important documentary evidence, bear against the verdict. The parol evidence is conflicting. The presiding judge granted a new trial. The supreme court will forbear to interfere.

3. The learned counsel who argued for the plaintiff in error, not only deprecated the exercise of discretion in granting new trials, but attacked discretion as a sort of judicial monstrosity, and gave it little or no quarter. He insisted that the doctrine of discretion in the matter of granting or refusing new trials was of late origin, and was not to be found in the early cases decided by this court. We think he is mistaken. The doctrine is no novelty here, but received recognition in several early cases. See 1 *Ga.*, 41, 556, 610 ; 2 *Ib.*, 173 ; 3 *Ib.*, 310 ; 4 *Ib.*, 437 ; 6 *Ib.*, 186 ; 7 *Ib.*, 436 ; 9 *Ib.*, 19 ; 13 *Ib.*, 387 ; 14 *Ib.*, 597 ; 16 *Ib.*, 27.

Judgment affirmed.